Elizabeth Keebler, Widow, Jeanette Keebler, Walter J. Keebler, J. Albert Keebler, Charles Keebler and Kirk Q. Bigham, Guardian ad litem of Della May Keebler, Appellants, *v.* Martha Louisa Shute.

*Wills—Devisavit vel non—Practice.*

On an issue devisavit vel non where several questions are propounded by the orphans' court, the jury should answer each question separately.

*Wills—Issue—Devisavit vel non—Testamentary capacity—Province of court and jury.*

In a proceeding devisavit vel non where one of the issues is "whether at the time of signing said paper writing the decedent had testamentary capacity," it is improper to add the issue "whether the decedent had a full and intelligent understanding of the nature of said paper writing and of the dispositions it contained." The repetition of the question as to tes-

tamentary capacity in different phraseology is not only unnecessary, but is calculated to cause confusion and to embarrass the trial judge in his effort to present the subject clearly and concisely to the jury.

On an issue to determine whether an alleged testator has testamentary capacity, a verdict and judgment in favor of the contestant will be sustained where the evidence for the contestant, although contradicted, tended to show lack of testamentary capacity, and the trial judge laid down the proper legal rules by which the jury were to be governed in reaching their verdict.

Argued Oct. 27, 1897. Appeal, No. 84, Oct. T., 1897, by plaintiffs, from judgment of C. P. No. 1, Allegheny Co., March Term, 1896, No. 678, on verdict for defendant. Before STER-RETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Issue devisavit vel non. Before COLLIER, J.

At the trial it appeared that Jacob Keebler had been engaged extensively in business in the city of Pittsburg for many years prior to 1880 as a contractor and builder, and had accumulated considerable property. In 1880 he received a sun stroke, where-upon he retired from active business life, although he continued to manage his property until 1885 when he removed to Peters-burg, Ohio, and lived upon a farm. He was married twice. By his first wife he had one child, Martha, the defendant. When this child was about six years old he married his second wife, by whom he had the children who, with their mother, are the plain-tiffs in this case. As Martha grew up, unpleasant relations arose between her and her step-mother and half brothers and half sisters. In 1891, when testator was about seventy years of age, he executed a will by which he left to Martha $5.00 only. In 1892 he went back to Pittsburg, where he died in 1894. There was much evidence on the part of the defendant tending to show mental incapacity, which was contradicted by testimony on the part of the plaintiffs.

The issues are stated in the opinion of the Supreme Court.

The court below charged as follows :

The first question that the orphans' court has sent here for us to decide is, whether said Jacob Keebler in fact signed and exe-cuted said paper writing. Jacob Keebler made a paper, or a paper was made, signed by Jacob Keebler, called his last will

and testament, and the first question you are to determine is whether Jacob Keebler in fact signed and executed that paper. It is not a question whether he signed his name without any assistance; without anybody helping him; that is not the question you are trying, because the law does not require that; but the question is whether in fact it was signed and executed by him. Upon that question you will have to pass first, because upon that question hang all the other questions, and you are to examine the testimony with great care, particularly as it is testified in the defense here that the old gentleman who made this will, or alleged will, was old, somewhat feeble, and it is admitted that his memory was not as good as that of a man of less years; in other words, he was afflicted with the infirmities and peculiarities that a man of his age is ordinarily afflicted with, and in that view, you are to examine the evidence with great care, to see whether in fact Jacob Keebler signed this paper. Then, again, it is not necessary for him to call on anybody to assist him. It is a fact that you are to consider, however. It is not necessary for him to actually call upon some one for assistance, and say, " I cannot write my name; you assist me," provided he knew and understood fully what he was about. In this case, when the daughter had hold of his hand, if he knew clearly that he was signing his name with the assistance of his daughter, it was not necessary for him to actually ask her to help him sign it. You saw the name, and will judge whether it was written by the testator, with assistance, or whether it is a signature made by some other person. If he comprehended at the time exactly what he was about, and knew that he was making this will and signing it with this assistance of his daughter, then he did in fact sign and execute this will. You must examine all the evidence carefully, but you will remember his age and the consequent infirmities and peculiarities (as we will remember our own, if we live long enough), and you will remember that the law does not impute the same skill and strength to a man when he is sixty-eight or seventy years of age that it does when he is forty, forty-five or fifty, in the prime of life. You will take all these circumstances into consideration. Some of you, yourselves, are probably getting old, and will appreciate better than younger men what the court means. The peculiarities and infirmities of age are all to be taken into account. . . .

You heard the evidence upon this question, and if you believe that this old gentleman, Jacob Keebler, under the circumstances, as explained to you, understood what he was about when he signed this will; if he knew what it was and·what he was doing, and the daughter assisted him, that is all that is necessary. You heard Miss Keebler testify as to her conversation with her father the day before the signing of the paper, in which she was asked to help him, or at least she said she would help him if he needed help. That would explain why she did actually help him, but without that, if you believe he knew he was going to sign his name to this paper, knowing it was his last will and testament, and understanding all about it, and knew that his daughter was assisting him, then he did actually sign and execute the will. You will see the letters of the name as they were made on this paper and judge by the very look of them whether they were made under such circumstances, or whether they were written by some other person. If the name was written by him with his daughter's assistance and he knew fully what he was about at the time, then the signature was in fact made by him.

Remember the burden of prooof is upon the defendant, or contestant. You must be clearly satisfied by the weight of evidence, when it is attacked, that this signature was not made by Jacob Keebler. If you think from the clear weight of the evidence that this is not his signature in fact, under the instructions I have given you, you will find for the defendant, Mrs. Shute, who is the contestant of the will. But if you think, under all the evidence, that this is the testator's name, made by him; that he understood what it was and signed it, and it was in fact his signature and execution, then the next question—and it seems to me, in this case, if you come that far—the most important question in the case, is this: The second item in the præcipe is whether at the time (that is, if you find that the paper was in fact signed and executed by Mr. Keebler) whether at the time of said signing of said paper writing, said Jacob Keebler had testamentary capacity. Now, although you may find that the name written on this "paper writing," as it is called, is Mr. Keebler's signature; that he signed and executed the paper, yet, if he had not testamentary capacity, it would be no will at all; it would be invalid. That

question, as I said, seems to the court the most important one
in the case, if you find that Jacob Keebler signed and executed
it.    And upon that, the court's opinion—you are not bound by
it, however—but the court's opinion is that the great strength
and weight of evidence is that that is his signature; that he
understood it; that he signed it with the help of his daughter.
But, as I said, you are not bound by that; I merely give it to
you that it may assist you in coming to a conclusion.    The
facts are for you entirely.

Now, had he testamentary capacity?    There, your duty and
the court's is very important, and it is important for this rea-
son: Every man, in this state particularly, has a right to make
a will about the property that he and his wife have accumu-
lated; he has a right to dispose of it just as he pleases, provided
he has testamentary capacity.    He has a right to leave out a
child unjustly, according to our theories, because we cannot tell
what is in the heart of a father.    You know, probably, of cases
in your own experience, where the testators have reasons for
disinheriting children that the world does not know and never
can know; they are not made public, but the testators have a
right, if they have testamentary capacity, to give their property
to any child or to all, just as they please; but they must have
testamentary capacity.    Because the court or jury, or both of
them together, may think in any case that the will is unjust, it
cannot be set aside on such ground as that.    We would violate
the law of the state and the law of justice and right if we should
set it aside merely on that ground, because, in that event, you
twelve men and this court might think it was unjust and set it
aside on that account, when in another hearing, before twelve
other men and another judge, they might come to the very op-
posite opinion, under the law and the evidence.    Hence, the
question is, not whether he justly did it in our opinion, but
whether he had testamentary capacity when he did it; whether
he knew what he was about when he did it.    If he had testa-
mentary capacity, and did know what he was about, that is all
the law requires.

But we are not left in doubt about what testamentary capac-
ity is.    It has been so often before our Supreme Court for so
many years, and so many cases have been decided, that there is
no difficulty now in understanding what the law means exactly,

by testamentary capacity, and in knowing what is required.  I will read to you a brief extract from a decision of our Supreme Court upon this important question, and call your close and particular attention to it:

"A man of sound mind and disposing memory, is one who has a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty.  It is not necessary that he collect all these in one review.  If he understands in detail all that he is about, and chooses with understanding and reason between one disposition and another, it is sufficient for the making of a will.  If, from any cause, he is so enfeebled in mind as to be incapable of knowing the property he possesses; of appreciating the effect of any disposition made by him of it; and of understanding to whom he intends to bequeath it, he is without the requisite testamentary capacity.  He must have memory.  A man in whom this faculty is totally extinguished cannot be said to possess understanding to any degree whatever, or for any purpose.  But his memory may be very imperfect; it may be greatly impaired by age or disease.  He may not be able at all times to recollect the names, the persons or the families of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered; and yet his understanding may be sufficiently sound for any of the ordinary transactions of life.  He may not have sufficient strength of memory and vigor of intellect to make and to digest all the parts of a contract, and yet be competent to direct the distribution of his property by will.  This is a subject which he may possibly have often thought of; and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing; more especially, in such a reduced state of mind and memory, he may be able to recollect, and to understand the disposition of his property which he had made by a former will, when the same is distinctly read over to him.  The question is not so much, what was the degree of memory possessed by the testator as this, Had he a disposing memory?  Was he capable of recollecting the property he was about to bequeath; the manner of distributing it, and the objects

of his bounty? To sum up the whole in the most simple and intelligent form—were his mind and memory sufficiently sound to enable him to know, and to understand, the business in which he was engaged at the time when he executed the will?

" Neither age, nor sickness, nor extreme distress or debility of body, will affect the capacity to make a will, if sufficient intelligence remains. The failure of memory is not sufficient to create the incapacity, unless it be total, or extend to his immediate family or property. The want of recollection of names is one of the earliest symptoms of the decay of the memory; but this failure may exist to a very great degree, and yet ' the solid power of the understanding ' remain."

That is the best definition of what is required upon the question of testamentary capacity that is in our books, and, with due respect to other courts of other states, I think it is one of the best in any state, because it is so clear in giving both sides of the question. Counsel are naturally apt to give their own side strongly, and we cannot blame them for it, but this definition of the law gives it clearly on both sides, and makes clear to the humblest understanding what is meant by testamentary capacity, and what is meant by want of testamentary capacity.

With that definition in your mind, examine all the evidence fairly on both sides, remembering that the burden is upon the defendant, Mrs. Shute, who contests this will of her father, to satisfy you that her father, Jacob Keebler, at the time he signed and executed this will, was not of sound mind and disposing memory; that is, that he did not have intellect enough to know what he was about. I will not go over the evidence upon that; you have heard it all, and it is for you. Remember that the burden is upon the defendant, and you must be satisfied from the clear weight of the evidence that this old man—remembering his age and the circumstances surrounding him—at the time he signed and executed this will, as shown by the testimony, was not of sound mind and disposing memory, before you can find in her favor. If he knew what he was doing; knew that he was making a will similar to the former one, with the exceptions detailed in the testimony, and understood fully what he was about, it would be valid, and, in that case, you should find for the plaintiffs. Whether he talked it over with his wife or not, makes no difference, if he came to this conclusion of his

own free will. And why he did it is no concern of ours. We cannot go into the heart of a testator and see how he feels towards his children. If he had mind enough to know what he was about; to know the property he possessed; to know the property he was giving and how he was disposing of it; to whom he was giving it; then that is all the disposing mind and memory that is required by the law. A man who is in his last illness, upon his last bed of sickness, who is enfeebled by disease, and is. about to leave this world for another, although his bodily infirmities may be great, although he may be racked by pain, may make a valid will, no matter what the extent of his property, if he knows what it is and understands what disposition he is making of it and has mind enough to know what he is doing, and the law protects him, because it is his property, and he can do as he pleases with it, as long as he has testamentary capacity, as explained before.

If the defendant has failed to satisfy you by the clear weight of the evidence that the testator in this case, Jacob Keebler, had not sufficient mind to make a valid will; that he had not a sound mind and disposing memory; that he did not comprehend what he was doing,—and the defendant is to satisfy you of this, mark you—you ought to find in favor of the plaintiffs on that question. If, on the other hand, you are satisfied of that, then it is your duty to find the other way. If you are satisfied by the clear weight of the evidence that at the time Jacob Keebler signed and executed this will he was not of sound mind and disposing memory; that he did not have testamentary capacity, then, it is equally your duty to find in favor of the defendant on that point. If you find in favor of the defendant, that would be against the will. The orphans' court has sent us another item to pass upon, and that is this: whether there was undue influence used to procure the execution by the said Jacob Keebler of the said paper writing, called a will. It is the duty of the court to say to you that there is no evidence in this case whatever of undue influence. All the evidence as to that is that the wife of some forty years standing talked to her husband, the testator, about it. There was no asking him to make an unrighteous will, and there is no evidence that she did. That being the case, whether there was undue influence or not, there being no evidence, you would find, and are directed to find, in

favor of the plaintiffs on that issue.. There was no undue influence by anybody shown.

The last item is whether the said Keebler had a full and intelligent understanding of the nature of said paper writing, and of the dispositions contained in it. I have gone over that in the question of testamentary capacity very fully, and if you find that he had not testamentary capacity, you will necessarily find that he had not a full and intelligent understanding of the nature of the paper writing he was signing and of the dispositions contained in it. If he did not sign that will, it is not, in fact, his, and if he did not have testamentary capacity, he could not have understood the disposition of his property.

Plaintiffs' point and answer thereto were among others as follows :

11. That under all the evidence in the case, on all the issues, the verdict must be in favor of the plaintiffs. *Answer:* That is refused and bill sealed for the plaintiffs. [5]

Verdict and judgment for defendant. Plaintiffs appealed.

*Error assigned,* among others was (5) above instruction, quoting it.

*J. S. Ferguson, E. G. Ferguson, Kirk Q. Bigham* and *E. H. Moore,* for appellants, cited, Matter of Cottrell, 95 N. Y. 330; Tilden v. Tilden, 13 Gray (Mass.), 110; Needham v. Ide, 5 Pick. (Mass.) 510; Stephenson v. Stephenson, 62 Iowa, 163; Heyward v. Hazard, 1 Bay (So. Car.), 349; Vandruff v. Rinehart, 29 Pa. 232; Cozzens' Will, 61 Pa. 196; Loeser's App., 167 Pa. 498; Wilson v. Mitchell, 101 Pa. 495; Cauffman v. Long, 82 Pa. 72.

*James E. O'Donnell,* with him *Albert H. Moeser,* for appellee, cited, Loeser's App., 167 Pa. 498; Wilson v. Mitchell, 101 Pa. 495.

OPINION BY MR. JUSTICE WILLIAMS, November 10, 1897 :

The will of Jacob Keebler was executed by him on June 24, 1891. He died in 1894, and his will was presented for probate. The testimony of the subscribing witnesses was of such a character that the register hesitated about granting letters testa-

mentary, and when he did so an appeal was at once taken to the orphans' court. After a hearing, that court framed four issues of fact and certified them into the common pleas for trial before a jury. These were, first: "Whether the said Jacob Keebler in fact signed and executed the said paper writing" which had been presented to the register as his last will and testament; and if so, then second: "whether at the time of signing said paper writing the said Jacob Keebler had testamentary capacity." The third issue was "whether there was undue influence used to procure the execution by the said Jacob Keebler of said paper writing." The fourth and last was to determine "whether the said Jacob Keebler had a full and intelligent understanding of the nature of said paper writing and of the dispositions it contained." The first of these issues was submitted to the jury with an expression of opinion by the court that "the great weight and strength of the evidence" was in favor of the execution of the will by the testator. The third was withdrawn from them by a binding instruction "that there is no evidence in this case whatever of undue influence." This left the question of testamentary capacity which was raised distinctly by the second issue, and repeated with a slight change of phraseology in the fourth. Upon this question the charge of the learned judge was clear, impartial and adequate. He carefully instructed the jury what constituted testamentary capacity and directed their attention in a general way to the evidence relating to the mental condition of Keebler at the time of the execution of his will, telling them that whether testamentary capacity existed at that time or not was for them to determine from the evidence before them. Whether the jury reached a wrong conclusion is not a question for our examination upon this record; but we are satisfied that the learned judge did his full duty in furnishing them with the legal rules by which they were to be governed in reaching a verdict.

There are two questions of practice however about which a few words seem to be needed, and this is a proper place in which to say them. First, the fourth issue certified into the common pleas in this case is wholly superfluous. The second covered the whole ground. If testamentary capacity is found to exist it is all the law requires. A repetition of the question in different phraseology is not only unnecessary, but is calcu-

lated to cause confusion and to embarrass the trial judge in his effort to present the subject clearly and concisely to the jury. It should be omitted. Second, it is better that the jury should answer the questions propounded by the orphans' court separately. Thus, in answer to the question contained in the first issue they could say " the jury find upon the first issue in favor of the plaintiff" (or defendant, as the case may be). " Upon the second issue the jury find in favor of the plaintiff " (or defendant). " Upon the third issue the jury find in favor of the plaintiff " (or defendant). In this way the exact findings upon the several issues can be returned to the orphans' court, and the ground on which the judgment finally rendered depends will be definitely shown by the record. Concurring in the opinion of the learned judge in this case, we affirm the judgment appealed from.